**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 22-80276-CIV-SMITH**

EPIC SYSTEMS CORPORATION,

     Plaintiff,

vs.                                 JURY TRIAL DEMANDED

GREATGIGZ SOLUTIONS, LLC,

     Defendant.

_____/

**DEFENDANT GREATGIGZ SOLUTIONS, LLC'S ANSWER,**
**AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S**
**ORIGINAL DECLARATORY JUDGMENT COMPLAINT**

GreatGigz Solutions, LLC ("Defendant" or "GreatGigz") hereby files this Answer, Affirmative Defenses, and Counterclaims to Plaintiff Epic Systems Corporation's ("Plaintiff" or "Epic") Original Complaint for Declaratory Judgment ("Complaint"):

**PRELIMINARY STATEMENT**

1.     GreatGigz admits that Plaintiff filed the present declaratory judgment action seeking a determination that the U.S. Patent No. 6,662,194 ("the '194 Patent"), U.S. Patent No. 7,490,086 ("the '086 Patent"), U.S. Patent No. 9,760,864 ("the '864 Patent") and U.S. Patent No. 10,096,000 ("the '000 Patent") (collectively the "Patents-in-Suit") are not infringed by Plaintiff.

2.     GreatGigz admits that it filed a patent infringement Complaint against Epic's customer, Christus Health, in United States District Court for the Western District of Texas, accusing Christus Health of infringing the Patents-in-Suit.

## JURISDICTION

3.      GreatGigz admits that this action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.* GreatGigz denies such claims.

4.      GreatGigz admits this allegation.

5.      GreatGigz admits this allegation.

## VENUE

6.      GreatGigz admits that venue is proper in this District.  GreatGigz otherwise denies this allegation to the extent it suggests that this is the most convenient venue for hearing this case.

## PARTIES

7.      GreatGigz does not deny but cannot admit this allegation.

8.      GreatGigz admits this allegation.

9.      GreatGigz admits that it licenses and enforces the Patents-in-Suit. GreatGigz denies that it is a "so-called non-practicing entity."

## FACTS

### The '194 Patent

10.      GreatGigz admits this allegation.

11.      GreatGigz admits that the abstract of the '194 Patent generally describes the '194 Patent.

12.      GreatGigz admits this allegation.

### The '086 Patent

13.      GreatGigz admits this allegation.

14.     GreatGigz admits that the abstract of the '086 Patent generally describes the '086 Patent.

15.     GreatGigz admits this allegation.

### The '864 Patent

16.     GreatGigz admits this allegation.

17.     GreatGigz admits that the abstract of the '864 Patent generally describes the '864 Patent.

18.     GreatGigz admits this allegation.

### The '000 Patent

19.     GreatGigz admits this allegation.

20.     GreatGigz admits that the abstract of the '000 Patent generally describes the '000 Patent.

21.     GreatGigz admits this allegation.

### Existence of an Actual Controversy

22.     GreatGigz admits this allegation.

23.     GreatGigz admits this allegation.

24.     GreatGigz admits that it has filed other suits alleging infringement of the Patents-in-Suit.

25.     GreatGigz admits this allegation.

26.     GreatGigz admits that Decapolis Systems, LLC ("Decapolis") has filed lawsuits against Epic and its customers asserting two patents-in-suit, admits that Decapolis voluntarily dismissed its suit against Epic without prejudice, and that Epic sued Decapolis for declaratory judgment on the two patents-in-suit. GreatGigz otherwise denies all remaining allegations.

27.     GreatGigz admits that a justiciable controversy exists.

28.     GreatGigz admits it asserts that Epic and/or its products and services infringe the Patents-in-Suit. GreatGigz otherwise denies all remaining allegations.

## COUNT ONE
### (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '194 PATENT)

29.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 through 28 above as though fully set forth herein.

30.     GreatGigz admits that a controversy exists among the parties.

31.     GreatGigz denies this allegation and demands strict proof thereof.

32.     GreatGigz denies this allegation and demands strict proof thereof.

33.     GreatGigz denies this allegation and demands strict proof thereof.  GreatGigz further denies that Plaintiff is entitled to any relief whatsoever.

## COUNT TWO
### (DECLARATORY JUDGEMENT OF NON-INFRINGEMENT OF THE '086 PATENT)

34.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 through 33 above as though fully set forth herein.

35.     GreatGigz admits that a controversy exists among the parties.

36.     GreatGigz denies this allegation and demands strict proof thereof.

37.     GreatGigz denies this allegation and demands strict proof thereof.

38.     GreatGigz denies this allegation and demands strict proof thereof.  GreatGigz further denies that Plaintiff is entitled to any relief whatsoever.

## COUNT THREE
### (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '864 PATENT)

39.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 through 38 above as though fully set forth herein.

40.     GreatGigz admits that a controversy exists among the parties.

41.     GreatGigz denies this allegation and demands strict proof thereof.

42.     GreatGigz denies this allegation and demands strict proof thereof.

43.     GreatGigz denies this allegation and demands strict proof thereof.   GreatGigz further denies that Plaintiff is entitled to any relief whatsoever.

## COUNT FOUR
### (DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '000 PATENT)

44.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 through 43 above as though fully set forth herein.

45.     GreatGigz admits that a controversy exists among the parties.

46.     GreatGigz denies this allegation and demands strict proof thereof.

47.     GreatGigz denies this allegation and demands strict proof thereof.

48.     GreatGigz denies this allegation and demands strict proof thereof.   GreatGigz further denies that Plaintiff is entitled to any relief whatsoever.

## PRAYER FOR RELIEF

GreatGigz denies all allegations in Plaintiff's Prayer for Relief, and further denies that Plaintiff is entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

1.     **Failure to State a Claim.** Each count fails to state a claim upon which relief may be granted.

2.     **Unjust Enrichment.** Plaintiff improperly enriched itself and should not benefit for its improper and illegal acts.

3.     **Validity.** GreatGigz affirmatively pleads that all of the Patents-in-Suit are valid.

4.      **Infringement.**   GreatGigz affirmatively pleads that Plaintiff has infringed, including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement), all valid, enforceable claims of the Patents-in-Suit.

5.      **Lack of Standing.**  Plaintiff does not have any right or standing to assert the claims at issue.

6.      **Legal Doctrine.**  Plaintiff's claims against GreatGigz are barred by one or more of the equitable doctrines of laches, estoppel, acquiescence, waiver, and unclean hands.

7.      **Reservation.**  GreatGigz reserves the right to assert additional affirmative defenses as they become known through additional investigation and/or discovery during the course of this litigation.

## GREATGIGZ SOLUTIONS, LLC'S COUNTERCLAIMS

For its counterclaims against Plaintiff Epic Systems Corporation ("Epic"), Counterclaim Plaintiff GreatGigz Solutions, LLC ("GreatGigz") alleges, on information and belief, as follows:

## THE PARTIES

1.      Counterclaim Plaintiff GreatGigz Solutions, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 600 S. Dixie Highway, Suite 605, West Palm Beach, Florida 33401.

2.      On information and belief, based solely on paragraph 7 of the Complaint as pled by Plaintiff, Epic Systems Corporation is a Wisconsin corporation with a principal place of business at 1979 Milky Way, Verona, Wisconsin 53593.

## JURISDICTION AND VENUE

3.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 and 2 above as though fully set forth herein.

4.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

5.     Epic has consented to the personal jurisdiction of this Court at least by commencing its action for declaratory judgment of non-infringement in this District, as set forth in its Complaint.

## PATENTS-IN-SUIT

6.     GreatGigz Solutions, LLC is the owner, by assignment, of U.S. Patent Nos. 6,662,194 ("the '194 Patent"); 7,490,086 ("the '086 Patent"); 9,760,864 ("the '864 Patent"); and 10,096,000 ("the '000 Patent") (hereinafter collectively referred to as "the GGS Patents").

7.     The GGS Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

8.     The inventions described and claimed in the GGS Patents were invented by Raymond Anthony Joao.

9.     The GGS Patents each include numerous claims defining distinct inventions.

10.    The priority date of each of the GGS Patents is at least as early as July 31, 1999. As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.

11.    For example, and as evidence of the stated non-routine aspects of the inventions, during prosecution of the '864 Patent, the patent examiner considered whether the claims of the '864 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  The patent examiner affirmatively and expressly found that the claims are in

fact patent eligible under 35 USC §101 because all pending claims are directed to patent-eligible subject matter, because none of the pending claims are directed to an abstract idea, and because there would be no preemption of the abstract idea or the field of the abstract idea.

12.     GreatGigz Solutions, LLC alleges infringement on the part of Defendant of the '194 Patent, the '086 Patent, the '864 Patent, and the '000 Patent (collectively as the "Asserted Patents").

13.     The '194 Patent relates generally to an apparatus and method for providing recruitment information, including a memory device for Storing information regarding at least one of a job opening, a position, an assignment, a contract, and a project, and information regarding a job Search request, a processing device for processing information regarding the job Search request On a detection of an occurrence of a Searching event, wherein the processing device utilizes information regarding the at least one of a job opening, a position, an assignment, a contract, and a project, Stored in the memory device, and further wherein the processing device generates a message containing information regarding at least one of a job opening, a position, an assignment, a contract, and a project, wherein the message is responsive to the job Search request, and a transmitter for transmitting the message to a communication device associated with an individual in real-time. *See* Abstract, '194 Patent.

14.     The '086 Patent relates generally to an apparatus, including a memory device which stores information regarding a job opening, position, assignment, contract, or project, and information regarding a job search request or inquiry, a processing device which processing the information regarding a job search request or inquiry On an automatic detection of an occurrence of a searching event which is an occurrence of a job posting, a posting of new or revised data or information, a news release of a business event, an employment-related event, an economic report,

industry-specific news, an event which creates an to fill a position, or an event which creates an interest to seek a position, and generates a message, containing the information regarding a job opening, position, assignment, contract, or project, responsive to the job search request or inquiry, and a transmitter which transmits the message to a communication device associated with an individual. *See* Abstract, '086 Patent.

15.     The '864 Patent relates generally to an apparatus, including a memory device for storing work schedule information or scheduling information for an individual, a transmitter for transmitting a job search request to a computer, wherein the computer is specially programmed for processing the job search request, for generating a message containing information regarding a job opening, a position, an assignment, a contract, or a project, and for transmitting the message to the apparatus in response to the job search request; a receiver for receiving the message; and a display for displaying at least some of the information contained in the message. *See* Abstract, '864 Patent.

16.     The '000 Patent relates generally to an apparatus, including a memory which stores work schedule information or scheduling information for an employer, hiring entity, individual, independent contractor, temporary worker, or freelancer; a receiver which receives a first request to obtain work schedule information or scheduling information for the employer, hiring entity, individual, independent contractor, temporary worker, or freelancer, and the first request is received from a first communication device; a processing device, specially programmed for processing information contained in the first request, generates a first message containing the work schedule or scheduling information for the employer, hiring entity, individual, independent contractor, temporary worker, or freelancer; and a transmitter for transmitting the first message to the first communication device or to a second communication device.  The apparatus processes information in a second request.  Information contained in the second request is based on the work

schedule information or the scheduling information contained in the first message.  *See* Abstract, '000 Patent.

17.     As noted, the claims of the Asserted Patents claim priority to at least July 31, 1999. At that time, the idea of launching Epic.com was still several years away.

18.     The claims of the Asserted Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, was not conventional or routine at the time of the invention.

19.     Further, the claims of the Asserted Patents contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

20.     Consequently, the claims of the Asserted Patents recite systems and methods resulting in improved functionality of the claimed systems and represent technological improvements to the operation of computers.

21.     The claims of the Asserted Patents overcome deficiencies existing in the art as of the date of invention and comprise non-conventional approaches that transform the inventions as claimed into substantially more than mere abstract ideas.  For example, as of the date of invention, "[j]ob searching activities and recruitment activities typically require efforts in introducing parties to one another, pre-screening the parties prior to, and/or subsequent to, an introduction, acting as an information gathering entity for a party, exchanging information in order to determine if a relationship is appropriate and/or desirable, negotiating a deal, and/or consummating a deal between the respective parties.  While individuals and/or employers and/or hiring entities can act on their own behalf during most of the process, one of the parties may typically enlist the efforts of an employment agency or agencies, a recruiter(s), a so-called 'headhunter(s)', an employment

and/or career consultant(s), a temporary employment agency or agencies, a personal agent(s), a personal manager(s), and/or another intermediary or intermediaries, sometimes at great expense." '194 Patent at 1:59-2:6.  The inventions as claimed overcome these deficiencies in the state of the art and provide substantial cost savings to all parties.  As explained, as of the date of invention, "[t]he enlistment of employment agencies, recruiters, so-called 'headhunters', employment and/or career consultants, temporary employment agencies, personal agents, personal managers, and/or other intermediaries, can be costly and can lead to job search efforts and/or recruitment efforts which may be limited in breadth and/or scope by the personal and/or individual contacts, limitations and/or constraints associated with the employment agency, recruiter, so-called 'headhunter', employment and/or career consultant, temporary employment agency, personal agent, personal manager, and/or other intermediary."  *Id.* at 2:7-17.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for a costly middle-man in the process is overcome.  *Id.* at 2:18-24; 6:45-55.

22.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time.  As explained, as of the date of invention, "[j]ob searching efforts and recruitment efforts may be limited by and/or be constrained by limited personal contacts, geographical constraints, monetary constraints, and/or time constraints.  Oftentimes, individuals, employers and/or hiring entities, do not have the resources to conduct their own respective job searching efforts or recruitment efforts.  The enlistment of employment agencies, recruiters, so-called 'headhunters', employment and/or career consultants, temporary employment agencies, personal agents, personal managers, and/or other intermediaries, may not be sufficient to overcome these limitations and/or constraints, particularly, if the respective employment agency or agencies, recruiter(s), so-called 'headhunter(s)',

employment and/or career consultant(s), temporary employment agency or agencies, personal agent(s), personal manager(s) and/or other intermediary or intermediaries, are working with similar limitations and/or constraints." *Id.* at 2:26-42. As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for extensive personal contacts and geographical proximity are overcome.

23. The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time. As explained, as of the date of invention, "[t]he job search process and/or the recruitment process can typically be rendered more difficult in instances when additional information may be requested by one or by both of the parties concerning a counterpart. This typically results in time delays and/or additional expense to the party having to comply with such a request." *Id.* at 2:43-48. As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for time-consuming delays is overcome.

24. The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time. As explained, as of the date of invention, "[j]ob searching efforts and/or recruitment efforts may further be rendered more difficult when the parties are not properly pre-screened, thereby resulting in wasted time and effort, and/or when the parties are not properly informed as to the needs and/or demands of a counterpart. The needs and/or demands can include job description, job needs, project description, assignment description, salary, compensation, and/or other related information. The failure to pre-screen the parties and/or to conduct a dialog and/or initiate interviews and/or discussions when the parties may be so far apart regarding their respective needs, requests and/or expectations, for example, those involving job duties and/or salary, can result in wasted time and effort." *Id.* at

2:49-61. As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the associated time and effort are reduced, resulting in more efficient processes and cost savings for all involved.

25. The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time. As explained, as of the date of invention, "[c]onfidentiality is typically another concern in job searching activities and/or in recruitment activities. Individuals, employees, and/or hiring entities may have an interest in, and/or a desire for, maintaining confidentiality during at least some initial stages of any job search and/or recruitment effort. In some instances, once an initial interest is expressed, any confidentiality which may have existed may be lost for the remainder of the process. Sometimes, it may be desirable for an individual, an employer and/or hiring entity, to retain at least some level of confidentiality and/or anonymity further into the job search and/or recruitment process. In this manner, at least some confidentiality and/or anonymity can be preserved, especially if a deal between the parties is not ultimately reached." *Id.* at 2:62-3:8. As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for confidentiality in the process is enhanced. *See id.* at 6:59-65.

26. As noted above, during prosecution of the '864 Patent, the patent examiner considered whether the claims of the '864 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*. The patent examiner expressly found that the claims are in fact patent eligible under 35 USC §101 because all pending claims are directed to patent-eligible subject matter, none of the pending claims are directed to an abstract idea, and there would be no preemption of the abstract idea or the field of the abstract idea. For these same reasons, all of the claims of the Asserted Patents are patent-eligible.

27.     The '194 Patent was examined by Primary United States Patent Examiner Franz Colby.  During the examination of the '194 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 705/1, 10, 11, 705/26, 707/104.1, 10, 3, and 103R.

28.     After conducting a search for prior art during the examination of the '194 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,164,897, 11/1992, Clark et al.; (ii)  5,832,497, 11/1998, Taylor; (iii) 5,884.270, 3/1999, Walker et al.; (iv) 5,884.272, 3/1999, Walker et al.; (v) 5,978,768, 11/1999, McGovern et al.; (vi) 6,324,538, 11/2001, Wesinger, Jr. et al.; (vii) 6,332,125, 12/2001, Callen et al.; (viii) 6,363,376, 3/2002, Wiens et al.; (ix) 6,370,510, 4/2002, McGovern et al.; (x) 6,381,592, 4/2002, Reuning; and (xi) 6,385,620, 5/2002, Kurzius et al.

29.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '194 Patent to issue.  In so doing, it is presumed that Examiner Colby used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Colby has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

30.     The '194 Patent is a pioneering patent and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Ricoh, Robert Half International, IBM, Yahoo!, Oracle, Amazon, Monster, and CareerBuilder.

31.     The '086 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus.  During the examination of the '086 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 707/104.1, 707/3, 10, 103R, 1, 2, 4, 5, 705/1, 10, 11, and 705/26.

32.     After conducting a search for prior art during the examination of the '086 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 4,625,081, 11/1986, Lotito et al.; (ii) 5,164,897, 11/1992, Clark et al.; (iii) 5,978,768, 11/1999, McGovern et al.; (iv) 6,370,510, 4/2002, McGovern et al.; (v) 6,381,592, 4/2002, Reuning; (vi) 6,385,620, 5/2002, Kurzius et al.; (vii) 6,567,784, 5/2003, Bukow; (viii) 6,662,194, 12/2003, Joao; (ix) 6,873,964, 3/2005, Williams et al.; (x) 7,148,991, 12/2006, Suzuki et al.; and (xi) 2003/020531, 6/2003, Parker.

33.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '086 Patent to issue.  In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

34.     The '086 Patent is a pioneering patent and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Xerox, Yahoo!, EDS, Microsoft, CareerBuilder, Monster, LinkedIn, and IBM.

35. The '864 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus. During the examination of the '864 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 707/758.

36. After conducting a search for prior art during the examination of the '864 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,164,897, 11/1992, Clark; (ii) 5,758,324, 5/1998, Hartman; (iii) 5,832,497, 11/1998, Taylor; (iv) 5,862,223, 1/1999, Walker; (v) 5,884,270, 3/1999, Walker; (vi) 5,884,272, 3/1999, Walker; (vii) 5,978,768, 11/1999, McGovern; (viii) 6,157,808, 12/2000, Hollingsworth; (ix) 6,266,659, 7/2001, Nadkarni; (x) 6,370,510, 4/2002, McGovern; (xi) 6.381,592, 4/2002, Reuning; (xii) 6,398,556, 6/2002, Ho; (xiii) 6,408,337, 6/2002, Dietz; (xiv) 6,409,514, 6/2002, Bull; (xv) 6,466,91, 10/2002, Mitsuoka; (xvi) 6,718,340, 4/2004, Hartman; (xvii) 6,873,964, 3/2005, Williams; (xviii) 7,054,821, 5/2006, Rosenthal; (xix) 7,305,347, 12/2007, Joao; (xx) 7,523,045, 4/2009, Walker; (xxi) 2001/0042000 Al, 11/2001, Defoor, Jr.; (xxii) 2002/0002476 A1, 1/2002, Mitsuoka; (xxiii) 2002/0152316 A1, 10/2002, Dietz; and (xxiv) 2005/0010467 A1, 1/2005, Dietz.

37. After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '864 Patent to issue. In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims. *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014). It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill. *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

38.     The '864 Patent is a pioneering patent and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Ricoh, Robert Half International, IBM, Yahoo!, Xerox, Amazon, Monster, HP, CareerBuilder, Microsoft, LinkedIn, and General Electric.

39.     The '000 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus.  During the examination of the '000 Patent, the United States Patent Examiner searched for prior art across multiple classifications.

40.     After conducting a search for prior art during the examination of the '000 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,884,272, 3/1999, Walker; (ii) 6,266,659, 7/2001, Nadkarni; (iii) 6,370,510, 4/2002, McGovern; (iv) 6,457,005, 9/2002, Torrey, (v) 7,305,347, 12/2007, Joao; and (vi) 2002/0120532 A1, 8/2002, McGovern.

41.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '000 Patent to issue.  In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

42.     The '000 Patent is a pioneering patent and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such

technology leaders as Ricoh, Robert Half International, General Electric, IBM, AT&T, HP, Yahoo!, Xerox, Monster, Amazon, CareerBuilder, Microsoft, Oracle, and LinkedIn.

43.     The claims of the Asserted Patents were all properly issued and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration. *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

## <u>THE ACCUSED INSTRUMENTALITIES</u>

44.     On information and belief, Epic provides a web platform hosted on a server, including, but not limited to, the MyChart patient portal, comprising memory, processors, software, transmitters and/or receivers ("Accused Instrumentalities") through which Epic's customers provide health care services. For example, in paragraphs 2 and 23 of Epic's Complaint, Epic asserts that it provides the MyChart patient portal to its customer Christus Health. Christus Health uses the MyChart patent portal provided by Epic to provide health care services to its customers (including, but not limited, to family medicine, pediatrics, cardiology, internal medicine, neurology, optometry, orthopedic surgery, podiatry, pulmonology, urgent care services, vascular surgery and virtual visits) through Christus Health locations (including Christus Health specialty clinics). See Figure 1, which is a screenshot from the MyChart patient portal.



Figure 1[1]

# COUNT I
## Infringement of U.S. Patent No. 6,662,194

45.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 through 44 above as though fully set forth herein.

46.     Epic has been on actual notice of the '194 Patent at least as early as the date it filed its Declaratory Judgment Complaint (Dkt. No. 1).

47.     On information and belief, Epic owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

48.     On information and belief, Epic has directly infringed and continues to directly infringe at least Claim 25 of the '194 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

49.     On information and belief, the Accused Instrumentalities comprise an apparatus for providing recruitment information.  For example, Epic provides a web platform hosted on a server

---

[1] Source, as visited on December 13, 2021:
https://mychart.christushealth.org/mychart/openscheduling?_ga=2.197131049.461260859.16391 57137-584041037.1639157137

(the "MyChart" patient portal), comprising memory, processors, software, transmitters and/or receivers ("Accused Instrumentalities") through which Epic's customers provide health care services. For example, one of Epic's customers, Christus Health, provides health care services (including, but not limited, to family medicine, pediatrics, cardiology, internal medicine, neurology, optometry, orthopedic surgery, podiatry, pulmonology, urgent care services, vascular surgery and virtual visits) through Christus Health locations (including Christus Health specialty clinics) using the MyChart patient portal provided by Epic. *See* Figure 1 above.

50.     On information and belief, Epic's Accused Instrumentalities include a memory device for storing at least one of work schedule information and scheduling information for at least one of an individual, an independent contractor, a temporary worker, and a freelancer. For example, the servers that implement Epic's MyChart patient portal store and provide work schedule information for individual health care providers ("at least one of an individual, an independent contractor, a temporary worker, and a freelancer") of Christus Health such that the individual health care providers can be notified about scheduled appointments. *See* Figure 1 above and Figure 2 below, which is a screenshot from MyChart patient portal.



Figure 2[2]

---

[2] Source, as visited on December 13, 2021:
https://mychart.christushealth.org/mychart/openscheduling?_ga=2.197131049.461260859.16391
57137-584041037.1639157137

51.     On information and belief, the Accused Instrumentalities include a receiver for receiving a first request, wherein the first request contains information regarding a request to obtain at least one of work schedule information and scheduling information for the at least one of an individual, an independent contractor, a temporary worker, and a freelancer, wherein the first request is received from a first communication device associated with an employer or hiring entity. For example, the servers that implement Epic's MyChart patient portal receive a first request containing information regarding scheduling information of individual employees (health care providers) of Christus Health when a customer ("employer or a hiring entity ") schedules an appointment using a mobile device, laptop or PC ("a first communication device associated with an employer or hiring entity"). The scheduling information is used to notify individual employees (health care providers) about scheduled appointments. *See* Figures 1 and 2 above.

52.     On information and belief, Epic's Accused Instrumentalities include a processing device for processing information contained in the first request, wherein the processing device generates a first message containing the at least one of work schedule information and scheduling information for the at least one of an individual, an independent contractor, a temporary worker, and a freelancer. For example, the servers that implement Epic's MyChart patient portal, in response to the customer's request for scheduling an appointment, generate a timetable ("first message") which contains the work schedule information or the scheduling information of individual health care providers of Christus Health. This timetable is displayed to the customer which allows the customer to then select an appropriate time to meet with the individual employee (health care provider). *See* Figures 1 and 2 above.

53.     On information and belief, Epic's Accused Instrumentalities further include a transmitter for transmitting the first message to the first communication device. For example, the

servers that implement Epic's MyChart patient portal transmit the first message to the first communication device (used by the customer) via the Internet, causing display of the timetable to the customer and allowing the customer to select the date and time of the appointment and initiate the scheduling process (by clicking on one of the available times listed for a health care provider). *See* Figure 2 above.

54.     On information and belief, Epic's Accused Instrumentalities include a receiver wherein the receiver receives a second request, wherein the second request contains information for at least one of reserving, engaging, and requesting, the services of the at least one of an individual, an independent contractor, a temporary worker, and a freelancer, wherein at least one of the processing device processes the information contained in the second request and at least one of reserves, engages, and requests, the services of the at least one of an individual, an independent contractor, a temporary worker, and a freelancer, the processing device generates a second message containing information regarding the second request, and the transmitter transmits a second message containing information regarding the second request to a second communication device associated with the at least one of an individual, an independent contractor, a temporary worker, and a freelancer. For example, after the customer selects the date and time of the appointment and initiates the scheduling process (by clicking on one of the available times listed for a health care provider), a second request containing information for reserving, engaging, or requesting, the services of the individual (e.g., a health care provider) is sent to the servers that implement Epic's MyChart patient portal. Further, On information and belief, the servers that implement Epic's MyChart patient portal transmit the second message to a device (e.g., a computer or mobile device) associated with a health care provider (for example, the health care provider's computer or mobile device or the computer or mobile device of an employee at the Christus Health

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS                                          22

location where the health care provider works). *See* Figure 2 above and Figures 3 and 4 below, which are screenshots from the MyChart patient portal.



Figure 3[3]



[3] Source, as visited on December 13, 2021:
https://mychart.christushealth.org/mychart/openscheduling?_ga=2.197131049.461260859.16391
57137-584041037.1639157137

Figure 4[4]

55.     The foregoing infringement on the part of Epic has caused injury to GreatGigz.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '194 Patent.

56.     Each of Epic's aforesaid activities have been without authority and/or license from GreatGigz.

**COUNT II**
**Infringement of U.S. Patent No. 7,490,086**

57.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 through 56 above as though fully set forth herein.

58.     Epic has been on actual notice of the '086 Patent at least as early as the date it filed its Declaratory Judgment Complaint (Dkt. No. 1).

59.     On information and belief, Epic owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

60.     On information and belief, Epic has directly infringed and continues to directly infringe at least Claim 18 of the '086 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

61.     On information and belief, the Accused Instrumentalities comprise an apparatus for providing recruitment information.  For example, Epic provides a web platform hosted on a server (the "MyChart" patient portal), comprising memory, processors, software, transmitters and/or receivers ("Accused Instrumentalities") through which Epic's customers provide health care

---

[4] Source, as visited on December 13, 2021:
https://mychart.christushealth.org/mychart/openscheduling?_ga=2.197131049.461260859.16391 57137-584041037.1639157137

services. For example, one of Epic's customers, Christus Health, provides health care services (including, but not limited, to family medicine, pediatrics, cardiology, internal medicine, neurology, optometry, orthopedic surgery, podiatry, pulmonology, urgent care services, vascular surgery and virtual visits) through Christus Health locations (including Christus Health specialty clinics) using the MyChart patient portal provided by Epic.  *See* above.

62.     On information and belief, Defendant's Accused Instrumentalities include a memory device, wherein the memory device stores information regarding an individual available for at least one of applying for and interviewing for at least one of a job, a job opportunity, and a hiring need, and further wherein the memory device stores information regarding a recruitment search request or inquiry. For example, the servers that implement Epic's MyChart patient portal store and provide work schedule information for individual health care providers ("at least one of an individual, an independent contractor, a temporary worker, and a freelancer") of Christus Health such that the individual health care providers can be notified about scheduled appointments. *See* ¶ 49 above.

63.     On information and belief, the Epic Accused Instrumentalities comprise a memory device, which stores information regarding at individuals available for applying for a job opportunity or hiring need.  On information and belief, the Epic memory device stores information concerning shoppers who are available and willing to accept assignments (called "batches" by Epic).  Each such shopper, on information and belief, is employed by Epic as an Independent Contractor and is retained by users of the Epic apparatus to perform specific, defined tasks for the benefit of the user.  *See* ¶ 50 above.

64.     On information and belief, Epic's Accused Instrumentalities include a processing device, wherein the processing device processes the information regarding a recruitment search

request or inquiry upon a detection of an occurrence of a searching event, wherein the searching event is an occurrence of at least one of a job posting by at least one employer or at least one hiring entity, a posting of new or revised data or information from at least one individual or a group of individuals, a news release of a business event, an employment-related event, an economic report, industry-specific news, an event which creates an interest by at least one employer or at least one hiring entity to fill a position, and an event which creates an interest by at least one individual to seek a position, wherein the processing device automatically detects the occurrence of the searching event, wherein the processing device utilizes the information regarding an individual stored in the memory device in processing the information regarding a recruitment search request or inquiry, and further wherein the processing device generates a message containing information regarding the individual, wherein the message is responsive to the recruitment search request or inquiry. For example, the servers that implement Epic's MyChart patient portal allows Christus Health customers to schedule an appointment for health care services ("occurrence of at least one of a job posting by at least one employer or at least one hiring entity… an event which creates an interest by at least one employer or at least one hiring entity to fill a position"). The MyChart patient portal presents to a customer a plurality of fields (including the customer's name and contact information, the reason for the visit, and insurance information) which allow the customer to enter relevant details about their proposed visit. The servers that implement Epic's MyChart patient portal receive, store (using a memory device) and use the customer details to calculate to schedule an appointment for health care services. The servers that implement Epic's MyChart patient portal, in response to the customer's request for scheduling an appointment, generate a timetable ("message") which contains the work schedule information or the scheduling information ("information regarding an individual") of individual employees of Christus Health.

This timetable helps the customer to select an appropriate time for their health care appointment. *See* ¶ 52 above. *See also* Figure 5 below, which is a screenshot the MyChart patient portal.



Figure 5[5]

65.      On information and belief, Epic's Accused Instrumentalities include a transmitter, wherein the transmitter transmits the message to a communication device associated with an employer or hiring entity. For example, the servers that implement Epic's MyChart patient portal transmit the first message to the first communication device (used by the customer) via the Internet, causing display of the timetable to the customer and allowing the customer to select the date and time of the appointment (by clicking on one of the available times listed for a health care provider by clicking on one of the available times listed for a health care provider). *See* ¶ 53 above.

66.      The foregoing infringement on the part of Epic has caused injury to GreatGigz.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is

---

[5] Source, as visited on December 13, 2021:
https://mychart.christushealth.org/mychart/openscheduling?_ga=2.197131049.461260859.16391
57137-584041037.1639157137

in no event less than a reasonable royalty from the date of first infringement to the expiration of the '086 Patent.

67.     Each of Epic's aforesaid activities have been without authority and/or license from GreatGigz.

## COUNT III
## Infringement of U.S. Patent No. 9,760,864

68.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 through 67 above as though fully set forth herein.

69.     On information and belief, Epic owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

70.     On information and belief, Epic has directly infringed at least Claim 1 of the '864 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

71.     Upon information and belief, the Accused Instrumentalities comprise an apparatus for providing recruitment information.  For example, Epic provides a web platform hosted on a server (the "MyChart" patient portal), comprising memory, processors, software, transmitters and/or receivers ("Accused Instrumentalities") through which Epic's customers provide health care services. For example, one of Epic's customers, Christus Health, provides health care services (including, but not limited, to family medicine, pediatrics, cardiology, internal medicine, neurology, optometry, orthopedic surgery, podiatry, pulmonology, urgent care services, vascular surgery and virtual visits) through Christus Health locations (including Christus Health specialty clinics) using the MyChart patient portal provided by Epic.  *See* ¶ 49 above.

72.     On information and belief, Epic's Accused Instrumentalities include a memory device or a database, wherein the memory device or the database stores work schedule information or scheduling information of or for a plurality of individuals, independent contractors, temporary

workers, or freelancers. For example, the servers that implement Epic's MyChart patient portal store and provide work schedule information for individual health care providers ("at least one of an individual, an independent contractor, a temporary worker, and a freelancer") of Christus Health such that the individual health care providers can be notified about scheduled appointments. *See* ¶ 50 above.

73.     On information and belief, Epic's Accused Instrumentalities include a receiver, wherein the receiver receives a first request, wherein the first request contains information regarding a request to obtain work schedule information or scheduling information of or for an individual, an independent contractor, a temporary worker, or a freelancer, from among the plurality of individuals, independent contractors, temporary workers, or freelancers, wherein the first request is received from a first communication device associated with an employer or a hiring entity. For example, the servers that implement Epic's MyChart patient portal receive a first request containing information regarding scheduling information of individual employees (health care providers) of Christus Health when a customer ("employer or a hiring entity ") schedules an appointment using a mobile device, laptop or PC ("a first communication device associated with an employer or hiring entity"). The scheduling information is used to notify individual employees (health care providers) about scheduled appointments. *See* ¶ 51 above.

74.     Upon information and belief, Epic's Accused Instrumentalities include a processor, wherein the processor is associated with a website, and further wherein the processor is specially programmed to process or to provide job search information, recruitment information, or recruitment-related information, wherein the processor processes information contained in the first request, wherein the processor or the apparatus generates a first message in response to the first request, and wherein the first message contains the work schedule information or the scheduling

information of or for the individual, the independent contractor, the temporary worker, or the freelancer. For example, the servers that implement Epic's MyChart patient portal, in response to the customer's request for scheduling an appointment, generate a timetable ("first message") which contains the work schedule information or the scheduling information of individual health care providers of Christus Health. This timetable is displayed to the customer which allows the customer to then select an appropriate time to meet with the individual employee (health care provider).  *See* ¶ 52 above.

75.    On information and belief, Defendant's Accused Instrumentalities include a transmitter, wherein the transmitter transmits the first message to the first communication device on, over, or via, the Internet or the World Wide Web, wherein the apparatus receives a second request, wherein the second request contains information for reserving, engaging, or requesting, the services of the individual, the independent contractor, the temporary worker, or the freelancer. For example, the servers that implement Epic's MyChart patient portal transmit the first message to the first communication device (used by the customer) via the Internet, causing display of the timetable to the customer and allowing the customer to select the date and time of the appointment and initiate the scheduling process (by clicking on one of the available times listed for a health care provider). After the customer selects the date and time of the appointment and initiates the scheduling process (by clicking on one of the available times listed for a health care provider), a second request containing information for reserving, engaging, or requesting, the services of the individual (e.g., a health care provider) is sent to the servers that implement Epic's MyChart patient portal.  *See* ¶¶ 53 and 54 above.

76.    On information and belief, Epic's Accused Instrumentalities process the information contained in the second request and generates a second message containing

information regarding the second request, and further wherein the apparatus transmits the second message to a second communication device, wherein the second communication device is associated with the individual, the independent contractor, the temporary worker, or the freelancer. For example, after the customer selects the date and time of the appointment and initiates the scheduling process (by clicking on one of the available times listed for a health care provider), a second request containing information for reserving, engaging, or requesting, the services of the individual (e.g., a health care provider) is sent to the servers that implement Epic's MyChart patient portal. Further, upon information and belief, the servers that implement Epic's MyChart patient portal transmit the second message to a device (e.g., a computer or mobile device) associated with a health care provider (for example, the health care provider's computer or mobile device or the computer or mobile device of an employee at the Christus Health location where the health care provider works). *See* ¶ 54 above.

77.     The foregoing infringement on the part of Epic has caused injury to GreatGigz.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '864 Patent.

78.     Each of Epic's aforesaid activities have been without authority and/or license from GreatGigz.

**COUNT IV**
**Infringement of U.S. Patent No. 10,096,000**

79.     GreatGigz reasserts and incorporates by reference its responses to paragraphs 1 through 78 above as though fully set forth herein.

80.     On information and belief, Epic owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

81.     On information and belief, Epic has directly infringed at least Claim 1 of the '000 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

82.     On information and belief, the Accused Instrumentalities comprise an apparatus for providing recruitment information.  For example, Epic provides a web platform hosted on a server (the "MyChart" patient portal), comprising memory, processors, software, transmitters and/or receivers ("Accused Instrumentalities") through which Epic's customers provide health care services. For example, one of Epic's customers, Christus Health, provides health care services (including, but not limited, to family medicine, pediatrics, cardiology, internal medicine, neurology, optometry, orthopedic surgery, podiatry, pulmonology, urgent care services, vascular surgery and virtual visits) through Christus Health locations (including Christus Health specialty clinics) using the MyChart patient portal provided by Epic. *See* ¶ 49 above.

83.     On information and belief, Epic's Accused Instrumentalities include a memory device, wherein the memory device stores work schedule information or scheduling information for an employer or a hiring entity, or for an individual, an independent contractor, a temporary worker, or a freelancer. For example, the servers that implement Epic's MyChart patient portal store and provide work schedule information for individual health care providers ("at least one of an individual, an independent contractor, a temporary worker, and a freelancer") of Christus Health such that the individual health care providers can be notified about scheduled appointments. *See* ¶ 50 above.

84.     On information and belief, Epic's Accused Instrumentalities include a receiver, wherein the receiver receives a first request, wherein the first request contains information regarding a request to obtain work schedule information or scheduling information for the employer, the hiring entity, the individual, the independent contractor, the temporary worker, or

the freelancer, wherein the first request is transmitted from a first communication device associated with an employer or hiring entity or associated with an individual, an independent contractor, a temporary worker, or a freelancer. For example, the servers that implement Epic's MyChart patient portal receive a first request containing information regarding scheduling information of individual employees (health care providers) of Christus Health when a customer ("employer or a hiring entity ") schedules an appointment using a mobile device, laptop or PC ("a first communication device associated with an employer or hiring entity"). The scheduling information is used to notify individual employees (health care providers) about scheduled appointments. *See* ¶ 51 above.

85.     On information and belief, Epic's Accused Instrumentalities include a processing device, wherein the processing device is specially programmed for processing information contained in the first request, wherein the processing device generates a first message containing the work schedule information or the scheduling information for the employer, the hiring entity, the individual, the independent contractor, the temporary worker, or the freelancer. For example, the servers that implement Epic's MyChart patient portal, in response to the customer's request for scheduling an appointment, generate a timetable ("first message") which contains the work schedule information or the scheduling information of individual health care providers of Christus Health. This timetable is displayed to the customer which allows the customer to then select an appropriate time to meet with the individual employee (health care provider).  *See* ¶ 52 above.

86.     On information and belief, Epic's Accused Instrumentalities include a transmitter, wherein the transmitter transmits the first message to the first communication device or to a second communication device. For example, the servers that implement Epic's MyChart patient portal transmit the first message to the first communication device (used by the customer) via the Internet, causing display of the timetable to the customer and allowing the customer to select the date and

time of the appointment and initiate the scheduling process (by clicking on one of the available times listed for a health care provider). *See* ¶ 53 above.

87.     Upon information and belief, Epic's Accused Instrumentalities process information contained in a second request, wherein the second request contains information for offering services of the individual, the independent contractor, the temporary worker, or the freelancer, to the employer or hiring entity, or contains information for the employer or hiring entity reserving or requesting the services of the individual, the independent contractor, the temporary worker, or the freelancer, wherein the information contained in the second request is based on the work schedule information or the scheduling information for the employer, the hiring entity, the individual, the independent contractor, the temporary worker, or the freelancer, contained in the first message. For example, after the customer selects the date and time of the appointment and initiates the scheduling process (by clicking on one of the available times listed for a health care provider), a second request containing information for reserving, engaging, or requesting, the services of the individual (e.g., a health care provider) is sent to the servers that implement Epic's MyChart patient portal. Further, on information and belief, the servers that implement Epic's MyChart patient portal transmit the second message to a device (e.g., a computer or mobile device) associated with a health care provider (for example, the health care provider's computer or mobile device or the computer or mobile device of an employee at the Christus Health location where the health care provider works). *See* ¶¶ 54 and 76 above.

88.     The foregoing infringement on the part of Epic has caused injury to GreatGigz. The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '000 Patent.

89.     Each of Epic's aforesaid activities have been without authority and/or license from GreatGigz.

## PRAYER FOR RELIEF

WHEREFORE, GreatGigz respectfully requests the Court enter judgment against Epic as follows:

1.     Declaring that Epic has infringed each of the Asserted Patents;

2.     Awarding GreatGigz its damages suffered because of Epic's infringement of the Asserted Patents;

3.     Awarding GreatGigz its costs, attorneys' fees, expenses, and interest;

4.     Awarding GreatGigz ongoing post-trial royalties; and

5.     Granting GreatGigz such further relief as the Court finds appropriate.

## JURY DEMAND

GreatGigz Solutions, LLC demands trial by jury, under Fed. R. Civ. P. 38, on all issues in these Counterclaims.

Date: April 14, 2022                                Respectfully submitted,


/s/ *Marc J. Kesten*
Marc J. Kesten (Florida Bar Number 601801)
Email: marc@kestenlex.com
**MARC J. KESTEN, P.L.**
9220 NW 72nd Street
Parkland, Florida 33067
Telephone: (954) 600-9500

*and*

*/s/ René A. Vazquez*
René A. Vazquez
*Pro Hac Vice* anticipated
rvazquez@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (903) 405-3999

*Counsel for Defendant,*
*GreatGigz Solutions, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served on April 14, 2022 with a copy of this document via the Court's CM/ECF system.

/s/ *Marc J. Kesten*
Marc J. Kesten
